WISCONSIN POWER & LIGHT COMPANY, Appellant, vs. PUBLIC SERVICE COMMISSION and another, Respondents.

*May 10—June 21, 1939.*

For the appellant there were briefs by *Schubring, Ryan, Petersen & Sutherland,* and oral argument by *William Ryan* and *Ralph E. Axley,* all of Madison.

For the respondent Public Service Commission there was a brief by the *Attorney General, H. H. Persons* and *H. T. Ferguson,* assistant attorneys general, and oral argument by *Mr. Ferguson, Mr. Fulton Collipp,* city attorney of Adams, and *Mr. Persons.*

NELSON, J. The facts, other than those relating to the amount of just compensation, are not in dispute. They may be briefly summarized as follows: On July 9, 1914, long subsequent to the enactment of the public-utility law, the village (now city) of Adams granted to the plaintiff's predecessor, Friendship Electric Light & Power Company, an indeterminate permit. At about the same time, the same company obtained a similar permit from the village of Friendship. The south boundary line of the village of Friendship is the north boundary line of the city of Adams. Thereafter, a hydroelectric plant was constructed in the village of Friend-

ship and a distribution system which served both municipalities was erected. At first the electric energy was generated by the Friendship hydroelectric plant and an auxiliary engine. In 1923 or 1924, because of increased consumption of electricity, the existing generating facilities were overloaded. In response to a demand for additional generating capacity, a hydroelectric plant was constructed on the Little Roche-a-Cri creek some six miles distant from the village of Friendship. In 1926 the plaintiff acquired all of the property of the Friendship Electric Light & Power Company, which included the Friendship and Roche-a-Cri hydroelectric plants, the Dellwood extension, the distribution systems, and the indeterminate permits theretofore granted by both villages. Thereafter, the Roche-a-Cri plant was fully completed and other extensions and improvements made. A 23,000-volt line which ran from the village of Friendship to Dellwood was changed to a 2,300-volt line. A 33,000-volt transmission line was thereafter erected which ran from Necedah to Friendship, and from there to Kilbourn. Most of the power of the Friendship and Roche-a-Cri hydroelectric plants was used by the city of Adams and the village of Friendship. Any surplus power not needed was turned on to the 33,000-volt transmission line. Both the city of Adams and the village of Friendship have at all times been served by either the Friendship Electric Light & Power Company or the plaintiff. Both companies operated the several plants and distribution systems as a single unit. In 1930 both the city of Adams and the village of Friendship, by referendum elections duly held, voted to acquire the properties of the plaintiff, used and useful for the convenience of the public. The Public Service Commission and the plaintiff were notified of the results of the elections and of the determinations of the respective municipalities to acquire the plaintiff's properties. Following such notices the commission gave notices of public hearings relating to the fixing of just compensation and the terms and conditions of both acquisitions. The two proceedings

were consolidated for purposes of convenience and heard at the same time although consistently considered as separate proceedings. Hearings were held on October 2, November 5, December 5 and 6, 1930, and on November 10, 1932. On September 19, 1935, the commission issued an order fixing the amount of just compensation to be paid by the city of Adams for the property described in the order, at $30,000. The plaintiff applied for a rehearing which was granted. Several dates for the rehearing were fixed but no further testimony was taken until March 17, 1936. On January 29, 1937, the commission entered an order changing somewhat the description of the property to be acquired and again fixing just compensation at $30,000. At the hearing held on December 5 and 6, 1930, engineers employed by the commission were produced and testified as to the valuation of the distribution system in the city of Adams as of June, 1930. They testified that the reproduction cost new of the distribution system was $33,806; that its reproduction cost new, less depreciation, was $26,829. The plaintiff's engineers testified that the reproduction cost new of the distribution system was $36,041 and its reproduction cost new, less depreciation, was $30,213. An engineer employed by the city of Adams testified that the reproduction cost new of the distribution system was $36,806 and the depreciated value was $24,748. Upon the rehearing, the plaintiff's engineers testified that the reproduction cost new of the distribution system in Adams as of December 1, 1935, was $42,720 and its depreciated value as of that date was $34,669. Other facts will be stated in discussing the several contentions of the plaintiff.

Upon this appeal, the plaintiff makes four contentions which we shall consider in the order which serves our convenience.

The plaintiff contends that under the indeterminate permit which it holds and the law applicable thereto, sec. 196.57, Stats. 1929, the city of Adams had no right to acquire the distribution system alone, but must acquire other property of

the plaintiff which is actually used and useful for the convenience of the public. This contention is based upon the assertion that the distribution systems in Adams and Friendship, the hydroelectric plants in Friendship and on the Roche-a-Cri, the transmission line to Dellwood, and the distribution system there, constituted a single utility entity or unit which may not be separated into parts so as to permit the city of Adams to acquire only the distribution system located within its confines. It unquestionably appears from the history of the construction and operation of the properties mentioned that such properties have always been operated as a single unit, not only by the plaintiff but by the plaintiff's predecessor. But that fact is not a controlling factor. Plaintiff's predecessor obtained separate indeterminate permits from the village of Friendship and the village of Adams. The fact that they were obtained substantially at the same time and with the intention of constructing a unified system to be operated as a unit is of no materiality. The indeterminate permit granted by the village of Adams to plaintiff's predecessor gave to the village the right thereafter to acquire so much of the property as was used and useful for the convenience of the public. There never existed in the city of Adams any utility property other than that which may properly be described as an electric distribution system. All of the property constituting that system was included in the orders of the commission for which just compensation was fixed. The contention that the whole system was a single entity which could not be separated so as to permit the city of Adams to acquire the distribution system, which was all of plaintiff's property within its limits, is without merit. The law applicable to such situations was declared in unmistakable terms in *State ex rel. Wisconsin T., L., H. & P. Co. v. Circuit Court*, 162 Wis. 234, 155 N. W. 139, hereinafter called the *Menasha Case*. That case involved the acquisition by the city of Menasha of so much of the property of the plaintiff in that case as was actually

used and useful for the convenience of the public. There was no electric-generator plant in the city of Menasha. It was connected up with a utility unit which included Neenah, Menasha, and Appleton. It was contended that Menasha could not dismember the plant and take only a portion thereof, and that since the major portion of the utility property was in the city of Appleton, Menasha was powerless to acquire it. After reviewing the applicable statutes, the court said (p. 239):

"When in 1904 the city of Menasha granted a franchise to defendant to furnish commercial lighting and power to its residents, such grant constituted the defendant a public utility in Menasha. The fact that it was already one elsewhere or became one later is immaterial. The Menasha public utility thus created was an entity though owned and operated in connection with other public utilities. The change of its franchise to a compulsory indeterminate permit did not affect its separate entity. It is still a public utility in Menasha, and it is the property of that utility the city is seeking to condemn. The fact that the defendant operated another utility in Appleton and another in Neenah does not affect the separate entity of the Menasha utility. Nor does the fact that the Menasha utility gets its current from the Appleton utility, though the owner of both is the same, change the situation. So far as the record discloses, the plaintiff is seeking to condemn all the property belonging to the Menasha utility, but it does not propose to secure its current from the same source. It intends to generate its own current instead of buying it from the Appleton utility as the Menasha utility has heretofore done. For whatever may be the terms and conditions upon which the current has heretofore been supplied to the Menasha utility, the transaction amounts to a purchase by the latter and must be so considered in rate making for the Menasha utility. Defendant fails to distinguish between the property belonging to several utilities and that belonging to one. The distinction is as vital when there is one owner of all as it is when there are separate ownerships. The statute deals with the property of a utility as an entity, and such property is subject to condemnation

separately though used and owned in connection with that of other utilities. The construction placed upon the statutes by defendant would render it impossible for a municipality to condemn a utility serving it if the owner thereof owned or operated utilities in other cities in the aggregate larger than that sought to be condemned, which were connected with such utility by a common power plant or otherwise. Under such a construction public utilities in a dozen or more cities served by a power station located in the country could never be condemned by the municipalities which they serve because the major portion of their property would not be situate therein. At the time the public-utility law was passed it was common knowledge that a central power plant often supplied two or more utilities in different municipalities. The law did not intend to and did not put such utilities upon a different basis as to condemnation than those having their own power plants, and hence it provided that the existing plant of any utility may be separately condemned irrespective of its physical connection with other utilities. Under the old law utilities were granted franchises by municipalities; under the present law they are granted certificates of convenience and necessity by the railroad commission. Each when operating under its grant or the substituted indeterminate permit constitutes a complete separate public utility subject to condemnation by the municipality originally granting the franchise or for which the certificate of convenience and necessity was granted, irrespective of the fact that it may be owned or operated in conjunction with other utilities. Any other construction would nullify the statutory definition of a public utility."

Plaintiff seeks to distinguish that case on the ground that an indeterminate permit was not involved in the Menasha controversy. The franchise there considered had all of the characteristics of an indeterminate permit except that under it a verdict of a jury as to the necessity of taking was required. With that exception the ruling principles applicable are identical. In the recent case of *Wisconsin P. & L. Co. v. Public Service Comm.* 219 Wis. 104, 111, 112, 261 N. W. 711, 262 N. W. 257, hereinafter called the *Brooklyn Case,*

this court, after considering the law of the *Menasha Case,* said:

"The only difference between the acquisition there involved and the one involved here is that in that case the verdict of a jury as to necessity had to be taken, because the original franchise was granted before the utility law declared the franchises of all existing local utilities to be 'indeterminate permits.' Property of the utilities existing at the time all franchises were made indeterminate could not be acquired under the constitutional provision cited without the verdict of a jury. Franchises granted thereafter were accepted subject to the act, which did away with the jury verdict, and by their acceptance the utility waived the jury trial. In all other respects the acquisition of a utility by a municipality in the two classes of cases is precisely the same. In the *Menasha Case,* a jury had found that 'public necessity required the taking,' and the decision of this court reviewed the judgment of the circuit court entered upon that verdict. Thus the only question involved in that case was the power of Menasha to acquire the property of the relator 'actually used and useful for the convenience of the public' located within Menasha."

Those two cases impel the conclusion that the contention of the plaintiff is without merit. It appears without dispute that no part of the distribution system of the city of Adams extended beyond the city limits or served any rural customers, so there is no question here as to any such property. *Wisconsin P. & L. Co. v. Public Service Comm.* 224 Wis. 286, 272 N. W. 50, hereinafter called the first *Edgerton Case.*

The plaintiff further contends that since the major part of the property which it asserts constitutes a single utility entity is not within the city of Adams, the latter is without authority to acquire any of its property. Sec. 196.57, Stats.

Substantially the same contention was made and held to be without merit in the *Menasha Case, supra.* The contention overlooks the fact that separate indeterminate permits were granted by the villages of Friendship and Adams, and that any rights which the city of Adams had under the permit

granted by it were in no wise affected by the indeterminate permit granted by the village of Friendship under which the plaintiff's predecessor constructed and operated plants, and rendered service to the public. In the first *Edgerton Case, supra,* sec. 196.57, Stats., was considered. It was there said (p. 291):

"We agree with plaintiff that the legislature unquestionably had in mind that if the municipality took over this electrical plant,—'it should step in the shoes of the public utility owning the property and continue to furnish service not merely to the inhabitants within the city limits, but also to the people living near by but outside the city limits. If such were not the case, the acquisition by the city of only that part of the property which is located within the city, would deprive the people just outside the city of electrical service. . . . Undoubtedly, that is the reason why section 196.57 of the statutes contains the provision that the owner of the property consents to a further purchase of its property actually used and useful for the convenience of the public by the municipality in which the major part of it is situate.' "

It seems too clear for argument that sec. 196.57, Stats., when enacted, was intended to apply to the ordinary then existing public utility which served a given municipality and in addition some customer consumers beyond the limits of the municipality. To sustain the contention that the city of Adams cannot acquire any of the property of the plaintiff because the major part of the asserted utility entity is not within its limits would effectively nullify the statute not only as to the city of Adams but also as to many municipalities which are presently connected up with other municipalities in such a manner as to permit of the assertion that they are but parts of a larger utility entity. Such a construction would obviously nullify the intention of the legislature and render it impossible for many municipalities ever to acquire the properties of existing utilities.

The plaintiff further contends that the commission had no power to enter an order on September 19, 1935 (the first

order), in a proceeding which was instituted by an election held on June 24, 1930. This contention is based upon the fact that nearly five years had elapsed between the commencement of the proceeding and the decision of the commission, upon the further fact that during that period extensive reconstruction work was undertaken by the plaintiff at a cost of nearly $8,500, upon the further assertion that prices of materials and wages had changed, upon the fact that the personnel of the commission had completely changed, and that there was nothing to show that the electors of the city of Adams would then vote in favor of acquiring the distribution system within its limits as it existed in 1935. In our opinion, those facts furnish no basis in law for the contention that the commission lacked jurisdiction to decide the matters which the utility law requires it to determine. It may be said in passing that in our opinion the legislature never intended that the commission should take nearly five years in which to determine the questions presented to it in such proceedings. Compare *Wisconsin P. & L. Co. v. Public Service Comm.* 231 Wis. 390, 284 N. W. 586, 286 N. W. 392, hereinafter called the second *Edgerton Case.* The delay in this case, however, was occasioned by the commission's reserving its decision until this court had passed upon the asserted right of the plaintiff to have included in the just compensation to be paid it, so-called severance damages. That question was determined in the *Brooklyn Case, supra.*

The plaintiff earnestly contends that this controversy is ruled in its favor by the second *Edgerton Case, supra.* This contention is based upon the assertion that the commission, in 1935, fixed the just compensation for the Adams distribution system upon testimony given in 1930. Did it appear that the commission, in 1935, fixed just compensation as of June, 1930, we would have to hold such determination was so remote in point of time from the date of the actual taking as to make applicable the ruling in the second *Edgerton Case.* The record, however, does not support the assertion. It ap-

pears that the commission considered the testimony adduced in connection with certain verified reports made by the plaintiff to the commission subsequent to the hearings, and was able reasonably to calculate how much of the property which had been appraised by its engineers in 1930 had been retired, how much new construction had been done, how much additional depreciation should be deducted from the old property which was still a part of the system, and how much depreciation should be deducted from the cost of the property which entered into the new construction. We do not see how the plaintiff can assert that it was prejudiced by the commission's considering relevant information contained in the reports made by it to the commission. Upon the rehearing the plaintiff offered in evidence a new appraisal of the Adams distribution system prepared by its engineers as of December, 1935. This appraisal was considerably higher than that made by its engineers in 1930. At the conclusion of the testimony adduced by the plaintiff on rehearing, a memorandum was offered and received in evidence in which the engineers for the commission briefly summarized their conclusions as to value which took note of the retirement of old property and the installation of new. In the first decision, dated September 19, 1935, the commission said:

"We have considered the evidence presented to us as to that value, consisting, for the most part, of estimates by engineers of the company and the commission's engineering staff, of the 'reproduction cost new' and 'reproduction cost new less depreciation' of the physical property of the company in the city as indicated in an agreed inventory of the separate items or groups of such property. We have also considered the going value of the utility together with information in our files and submitted by the company as to its income and earnings for several years last past. We have taken into consideration the fact that there have been some retirements of and additions to the company's physical property since the date of the inventory above referred to; and the further fact that the property of the company now in the city has undergone some depreciation since the date of that

inventory and not shown in the valuations submitted by the engineers.

"From all of the evidence before us, we have concluded and find that the fair value of the property of the company which is subject to acquisition by the city, hereinafter specifically described, including going value and all other proper allowances, is the sum of $30,000, which amount we consider is the just compensation which should be determined in this case."

In its decision upon rehearing, dated January 29, 1937, the commission said:

"The grounds upon which the company urged that the commission's order in the Friendship acquisition proceeding was unreasonable and unlawful are identical with the grounds urged on its behalf in this proceeding. The merits of those grounds have been fully considered in both proceedings with the result that the same conclusion, essentially, is reached in this proceeding as was arrived at in the Friendship acquisition proceeding. The reasons for the conclusions so reached were fully set forth in the order made upon rehearing in the Friendship acquisition case, U–4059. Inasmuch as the proceedings have been conducted simultaneously and counsel for the parties is the same, we do not think it necessary to repeat in this order the discussion and reasons for the conclusion reached in this case that our order of September 19, 1935, should be affirmed except for essentially the same modifications as were made to our order of the same date in the Friendship proceeding. We refer to that discussion and those reasons, so far as they are here pertinent, with like effect as if herein set forth in full."

The decision upon rehearing in the Friendship proceeding was likewise dated January 29, 1937. (15 P. S. C. R. 1.) That decision is much fuller than the decision in the Adams proceeding. In that decision it was said with respect to the plaintiff's contention that there was no evidence of present-day values before the commission upon which the commission could determine the present-day value of any electrical property at Friendship (p. 11):

"While the commission may not have had formal proof of the prices paid for such additions, evidence was presented

upon the motion for rehearing both by the commission itself and by the company relating to the value of property as influenced by 1935 prices. The evidence presented by the company's valuation engineer has been carefully examined, and from that examination it appears to us that there was little, if any, difference in prices of materials and labor involved for the two years of 1930 and 1935; and it would further appear that if there is any such difference of consequence, the prices of 1935 on the whole were slightly lower than the corresponding prices in 1930.

"In view of that evidence we do not consider that there should be any change in our determination of just compensation in this case by reason of the objection of the company that evidence of present-day values is lacking.

"The company also urges upon its application for rehearing that it has made considerable additions to the property since the date of the determination of the village to acquire it. As before pointed out, the commission's order of September 19, 1935, actually took into consideration the net additions, after proper allowance for retirements to such property up to August 1, 1935. While a considerable time has elapsed since the last-mentioned date, it is also true that a further considerable time is likely to elapse before any acquisition in this proceeding shall be consummated. We do not consider that it would serve any useful purpose for this commission to consider and determine at this time, the amount of net additions presently made to the property since August 1, 1935. Provision will be made in this order for just compensation to be paid for any and all net additions or retirements that may be made up to the time when the acquisition of the company's property shall be consummated. Such net additions or retirements can be estimated and arrived at from the date of August 1, 1935, just as conveniently and just as accurately as they could be if they were made from the date of this order."

Despite the fact that counsel for the commission contended upon the rehearing that just compensation should be fixed as of the date when the city of Adams determined to acquire the plaintiff's property, in which view counsel for the city of Adams concurred, the commission did not, in rendering its decision, follow those suggestions. The decision of

the commission left open for future adjustment just compensation for new construction and additions subsequent to 1935 and for materials and equipment on hand at the time of the actual transfer of the property to the city of Adams.

The trial court found that the evidence before it failed to establish to its full satisfaction that the compensation fixed and determined by the orders is unlawful in any particular, and concluded "that the just compensation as fixed and determined for said electric-utility property in said orders has not been shown to be unlawful." Sec. 197.07, Stats., provides that "if the plaintiff shall not establish to the full satisfaction of the court that the compensation fixed and determined in such order is unlawful, or that some of the terms or conditions fixed and determined therein are in some particulars unreasonable, judgment shall be entered affirming said order."

Sec. 196.46, Stats., provides that in proceedings commenced to set aside any determination of the commission the burden of proof shall be upon the party adverse to such commission to show by clear and satisfactory evidence that the determination of the commission is unreasonable or unlawful.

After carefully reviewing the proceeding, the evidence, the findings and conclusions of the commission, and the findings and conclusions of law of the trial court, we cannot say that the findings of the trial court are against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.